CA No. 23-4166

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

\*\*\*

NEBYOU SOLOMON,

      Plaintiff-Appellant,

v.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT, et al.

      Defendants-Appellees.

**PLAINTIFF-APPELLANT NEBYOU SOLOMON'S PETITION FOR PANEL REHEARING**

Appeal from the United States District Court for the District of Nevada,
Case No.: 2:19-cv-00652-CDS-DJA

**PLAINTIFF-APPELLANT NEBYOU SOLOMON'S PETITION FOR PANEL REHEARING**

Margaret A. McLetchie, Esq.
Nevada Bar No. 10931
Leo S. Wolpert
Nevada Bar No. 12658
MCLETCHIE LAW
602 South Tenth Street
Las Vegas, Nevada 89101
Telephone: (702) 728-5300
Fax: (702) 425-8220
Email: maggie@nvlitigation.com
*Attorney for Plaintiff-Appellant*
*Nebyou Solomon*

i

# <u>TABLE OF CONTENTS</u>

I.    QUESTIONS PRESENTED ON REHEARING...................................................1

II.   STATEMENT OF THE CASE.........................................................................2

III.  ARGUMENT.................................................................................................6

  A.  The Court's Factual Findings Are Erroneous. ....................................7

  B.  Solomon's Retaliation Claim Survives Summary Judgment Even if Probable Cause Existed. ........................................................................9

  C.  Whether Defendants' Restrictions Were Reasonable "Time, Place, and Manner" Restrictions Is Disputed. ......................................................14

IV.   CONCLUSION...........................................................................................17

**CERTIFICATE OF COMPLIANCE** ....................................................19

**CERTIFICATE OF SERVICE** ...........................................................20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Armster v. U.S. Dist. Ct. for Cent. Dist. of California*, 806 F.2d 1347 (9th Cir. 1986) ................................................................................................6

*Baker v. Clearwater Cnty.*, No. 22-35011, 2023 WL 3862511 (9th Cir. June 7, 2023) ..............................................................................................12

*Ballentine v. Tucker*, 28 F.4th 54 (9th Cir. 2022) ...............................................10, 11

*Forsyth County v. Nationalist Movement*, 505 U.S. 123, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ....................................................................17

*Garcia v. Adams*, No. 2:22-CV-01960-MMD-MDC, 2024 WL 3570953 (D. Nev. July 26, 2024), *aff'd sub nom. Garcia v. Corner Inv. Co., LLC.*, No. 24-5094, 2025 WL 1482990 (9th Cir. May 23, 2025) .........................................9

*Gonzalez v. Trevino*, 602 U.S. 653 (2024) (per curiam) ..........................................11

*Grady v. Cratsenburg*, 769 F. Supp. 3d 609 (E.D. Mich. 2025) ......................11, 12

*Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir.1994) ..................................17

*Hollamon v. City of Los Angeles*, 709 F. Supp. 3d 992 (C.D. Cal. 2023), aff'd, No. 24-341, 2025 WL 927310 (9th Cir. Mar. 27, 2025) ...........................................12

*Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850 (9th Cir. 2004) ............................................17

*McCullen v. Coakley*, 573 U.S. 464 (2014) .................................................... 14, 16

*Nieves v. Bartlett*, 587 U.S. 391, 139 S. Ct. 1715, 204 L. Ed. 2d 1 (2019) .......10, 11

*Parks v. City of Columbus*, 395 F.3d 643 (6th Cir. 2005) .......................................15

*Pouillon v. City of Owosso*, 206 F.3d 711 (6th Cir. 2000) ......................................15

*Rice v. Morehouse*, 989 F.3d 1112 (9th Cir. 2021) .................................................18

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) ..............................................................................................17

*Tuuamalemalo v. Greene*, 946 F.3d 471 (9th Cir. 2019) (per curiam) ....................18

*Zalaski v. City of Hartford*, 704 F. Supp. 2d 159 (D. Conn. 2010).........................15

**Statutes**

Clark County Code § 16.11.020(e)(4) ....................................................17

NRS 207.200.................................................................................8, 9

NRS 207.200(1)(a).............................................................................8

NRS 207.200(2) ................................................................................8

**Rules**

FRAP 40(b)(1)(A)..............................................................................6

I.    **QUESTIONS PRESENTED ON REHEARING**

1. Did the panel err in finding:

   a. Solomon was given an "instruction that Solomon vacate his location on the sidewalk and move west towards an alternative filming location" (Dkt. 60.1, p. 3), where video evidence does not reflect this;

   b. Solomon "concedes that he intended to continue filming in a restricted area;" (*id.*) and,

   c. "[r]ather than comply with Sgt. Fryman's instruction to pick up his camera equipment and move west down the sidewalk so as not to be trespassing, Solomon told officers he intended to film elsewhere on the FSM property and moved east" (*id.* at p. 4) where video evidence and Solomon's testimony do not reflect this?

2. Did the panel err in affirming summary judgment on Solomon's First Amendment Retaliation claim where there are genuine disputes of material fact regarding whether Solomon's First Amendment activity caused Fryman to detain him, particularly where Fryman declined to detain similarly situated individuals?

3. Did the panel err in concluding that Defendants' restrictions on Solomon's speech constituted reasonable "time, place, and manner" restrictions despite Solomon never being provided any alternative channel?

1

## II.   __STATEMENT OF THE CASE__

Photojournalist Plaintiff Nebyou Solomon set up his camera and tripod to film an April 15, 2017, protest from the south sidewalk of Fashion Show Boulevard. (3-ER-378 (at 20:25-21:12).) This sidewalk was open to pedestrian traffic. (2-ER-193 (at 51:17-20).) There were no visible markers to give Solomon notice of which areas were "private."[1] When Fashion Show Mall ("FSM") security requested Solomon leave the area, he summoned Defendant Sergeant Ryan Fryman; Fryman affirmed—contrary to Metro's policy[2] and the district court's finding that the sidewalk was a public forum[3]—that he believed the sidewalk was private. (3-ER-379 (at 22:10 – 23:15).)

Contrary to the panel's conclusion, video footage does not reflect any clear trespass order to leave the sidewalk. Not does it reflect that Fryman ever gave Solomon any instruction to "move west toward an alternative filming location[.]" (Dkt. 60.1, p. 3.) Rather, the interaction begins[4] with Fryman saying: "Unfortunately, this is the one thing for over here, this is just kind of strange for Vegas, I'm going to

---

[1] (*See also* EXHIBIT 3 at 4:32 – 4:39 (Solomon asks, "where is the sign that says it's private property?"))

[2] "On public property, media can only be restricted from a location where the general public is also restricted from going" and "[i]f an area is open to the public, the media can __*NOT*__ be denied access." (2-ER-304 (emphasis on "NOT" in original))

[3] (1-ER-10:1-4)

[4] Audio does not begin until 0:30.

continue how you think that this is actually a public walkway…" (EXHIBIT 3 at 0:33 – 0:40.)

Fryman then explains: "this is actually private property, just as that side is private property. The Trump side is allowing people to use the walkway, but Fashion Show is not allowing them to do that." (EXHIBIT 3 at 0:41-0:59.) Solomon attempts to explain that the sidewalk was public and demands to see a supervisor. (*Id.* at 1:00 – 1:20.)

Fryman then tells Solomon to "get your stuff and come over here by my vehicle and we'll explain everything to you." (EXHIBIT 3 at 1:21-1:23.) This is not a command to "go west" to find an "alternate filming location" but rather a command to go further onto FSM property—the area where the vehicle was parked[5]—to receive an "explanation." Indeed, Solomon objects that the parking area—not the sidewalk—was clearly FSM's private property. (*Id.* at 1:23 – 1:27.) Solomon then asks Fryman—attempting to comply with these unclear instructions—if the black metal railing[6] separating the pedestrian sidewalk was the demarcation line for "private property" before telling Fryman that he would "go over there," pointing east

---

[5] (*See* EXHIBIT 3 at 3:27 – 3:41 (Fryman escorting Solomon up rocky embankment to vehicle parked on FSM property))

[6] Solomon later testified: "at that moment, I just picked up my tripod and I started walking, thinking maybe they're talking about the rail – where the black rail was at … [m]aybe that part is the private part because it's leading to their – their property – actual property, a parking lot." (3-ER-379 (at 23:20 – 24:1).)

toward Las Vegas Boulevard. (*Id.* at 1:31 – 1:37.) Solomon then says, "if you're going to keep telling me this is private property…" before Fryman interrupts, saying "this is private property," to which Solomon replies, "okay," picks up his equipment, and begins walking east. (*Id.* at 1:38 – 1:46.) Fryman tells him that "all the way down … is private property." (EXHIBIT 3 at 1:45 – 1:48.)

Despite ***hoping*** to set up further down the street, Solomon never tries to set up after Fryman demanded he leave or informed him that the entire sidewalk was private property; rather, he continues to walk away from the only area he had been told was "private." Continuing to walk east, Solomon expresses incredulity that—despite being open to pedestrian traffic—the sidewalk was "private property;" however, he never indicates that he would attempt to film on the FSM sidewalk. (*Id.* at 1:49 – 1:59.) Instead of letting Solomon leave the "private property," Fryman orders Solomon to stop, repeatedly grabbing his arm while Solomon verbally objects; when Solomon asks why he grabbed him, Fryman responds, "***because you're yelling at me***." (*Id.* at 2:00 – 2:09.)

Even though Solomon—now surrounded by Metro officers—complies with the order to stop and puts his camera down, Fryman twice threatens Solomon that he is "about to go in cuffs." (EXHIBIT 3 at 2:10 – 2:16.) Solomon asks Fryman to let his arm go, picks up his camera and tries to move away from where he was trespassed; yet, Fryman again grabs and stops him. (*Id.* at 2:17-2:22.) After Solomon

expresses concern about his camera and demands that officers allow him to put it down, Fryman orders him detained; Contreras applies handcuffs. (*Id.* at 2:23-2:45.)

Fryman physically prevented Solomon from continuing to exit the undefined "private property." (3-ER-390 (at 66:20-21, 68:2-6; *see also* 3-ER-380 (at 26:24 - 27:1).) There is no evidence that officers gave Solomon the opportunity to film elsewhere. Rather, there is ample evidence that Fryman detained Solomon because Solomon verbally disagreed with him.

Furthermore, Fryman assumed Solomon, who is African-American, was an agitator despite his professional equipment (3-ER-433) and treated other photographers far differently.[7] That day, Fryman encountered a photographer who had been advised by Officer Meads that he was not permitted to remain on the FSM sidewalk[8] to take photos, whereupon Fryman engaged him in a lengthy discussion regarding his confrontational attitude and the nature of the FSM sidewalk—without making any physical contact. (EXHIBIT 10 at 1:17-5:30.) Though Fryman states that police have "no choice but to cite and arrest" people on the FSM sidewalk (*id.* at 2:32-2:34) and that taking pictures there would "one hundred percent, unequivocally" be a crime (*id.* at 3:55 – 4:04) Fryman does not arrest him. He gives

---

[7] This disparate treatment was corroborated by an eyewitness. (2-ER-215.)

[8] The civilian stated that Officer Meads asked him to "move on or ***go to the other side of the street***." (EXHIBIT 10 at 3:47-3:49.) In response, the civilian told Officer Meads to "go fuck [himself]." (*Id.* at 1:02-1:07.)

the photographer a choice: accept a citation, go to jail, or, pertinent here, ***walk across the street, either escorted by officers or at the crosswalk, when traffic clears***. (*Id.* at 5:30 – 6:08; 6:49 – 9:24.) Solomon was never given any such choice.

On November 9, 2023, the district court issued its order granting Defendants' Motion for Summary Judgment. (1-ER-3-21.) After briefing,[9] the panel heard oral argument on May 14, 2025.[10] On June 12, 2025, the panel issued a Memorandum Opinion affirming the district court's grant of summary judgment. (Dkt. 60.1.) Judge Sanchez concurred in part and dissented in part. (Dkt. 60.2.)

## III.  <u>ARGUMENT</u>

A petition for rehearing is intended for the "limited purpose" of bringing to the court's attention "points of law or fact which in the opinion of the petitioner the court has overlooked or misapprehended." *Armster v. U.S. Dist. Ct. for Cent. Dist. of California*, 806 F.2d 1347, 1356 (9th Cir. 1986); *see also* FRAP 40(b)(1)(A).

Here, discrepancies between the record and the panel's factual conclusions undermine the panel's legal conclusions. Specifically, Solomon was never ordered to move west and never conceded that he intended to continue filming on the FSM sidewalk. Based on these factual misapprehensions, the panel erred in concluding that there were no genuine disputes of material fact regarding Solomon's First

---

[9] (Dkt. 23.1 (Opening Brief); Dkt. 29 (Answering Brief); Dkt. 51 (Reply Brief).)

[10] *See* https://www.ca9.uscourts.gov/media/video/?20250514/23-4166/

Amendment claims. Thus, rehearing is warranted.

### A. The Court's Factual Findings Are Erroneous.

The panel held that Solomon "concedes that he intended to continue filming in a restricted area" (Dkt. 60.1, p. 3) and that "rather than comply with Sgt. Fryman's instruction to pick up his camera equipment and move west down the sidewalk so as not to be trespassing, Solomon told officers he intended to film elsewhere on the FSM property and moved east." (Dkt. 60.1, pp. 3-4.) However, as explained above, Solomon did not intend to continue filming in a restricted area, nor did he concede so. Rather, Solomon expressed confusion regarding where he could film from; before he could avail himself of the opportunity to move, Fryman detained him. This confusion is understandable; unlike others,[11] Solomon was never told that he could film elsewhere, nor was he told where exactly he could permissibly film.

Far from conceding that he would remain on the FSM sidewalk, all Solomon said was that **when he left the area he encountered Fryman,** he was going to set up "over there." (Oral Argument at 4:43; EXHIBIT 3 at 1:31 – 1:37.) Importantly, Solomon never tries to set up his camera after Fryman tells him he cannot film. There is at least a genuine dispute of material fact as to whether, by saying "over there,"

---

[11] The other photographer also expressed incredulity that the sidewalk was private, and Fryman conceded to him that it was "justifiable" that he might believe FSM's sidewalk was "public." (EXHIBIT 10 at 4:50 – 4:53.) Again, rather than detain him, Fryman directed him to a place he could photograph from. (*Id.* at 5:30 – 6:08.)

Solomon meant that, when he left the area he was trespassed from, he intended to film on the FSM sidewalk; indeed, he testified that he was moving away from the "private property" towards Las Vegas Boulevard's undisputedly public sidewalk.[12]

Regarding probable cause for trespassing, a person must "willfully" go or remain on private property "after having been warned by the owner." NRS 207.200(1)(a). Sufficient warnings include signage or fencing, or "the owner or occupant of the land or building making an oral or written demand to any guest to vacate the land or building." NRS 207.200(2). Here, there was no signage specifying which property was "private." Thus, the validity of the verbal "warning" given to Solomon and whether he was complying with it is central to whether probable cause existed to detain him for trespassing.

There is a dispute of fact as to whether this "warning" was sufficient, as Solomon was never clearly told where he was trespassed from and was never told to go west. When Fryman detained him, Solomon was not "remaining" but was moving east. (EXHIBIT 6 (at 1:05-1:25).) Rather than break any law, Solomon debated with Fryman, until Fryman physically prevented Solomon from continuing to exit the "private property." (3-ER-380 (at 26:24 – 27:1); 3-ER-390 (at 66:20-21); 3-ER-391 (at 68:2-6) Reading NRS 207.200 to permit arrest when a trespass warning is

---

[12] *See* n. 6, *supra*.

issued—without even giving Solomon an opportunity to remedy his alleged trespass—would render the notice requirement meaningless. Thus, there are at least disputed facts as to probable cause to believe that Solomon was *willfully*[13] remaining on the FSM sidewalk in violation of NRS 207.200.

### B. Solomon's Retaliation Claim Survives Summary Judgment Even if Probable Cause Existed.

In affirming summary judgment on Solomon's First Amendment Retaliation claim,[14] the panel found that "Defendants' motivations in arresting Solomon were content neutral" and that "Defendants had probable cause to believe Solomon was trespassing." (Dkt. 60.1, p. 3.) This was error. First, there are disputed material facts concerning whether Fryman's motivations were "content neutral" and whether there was a causal connection between Solomon's First Amendment activity and his detention. Second, as discussed above, Nevada's trespass statute requires prior notice and a ***willful*** effort to remain on private property; Solomon was not trespassing when he was attempting to leave but stopped by Fryman, thus negating

---

[13] *Cf. Garcia v. Adams*, No. 2:22-CV-01960-MMD-MDC, 2024 WL 3570953, at *4 (D. Nev. July 26, 2024), *aff'd sub nom. Garcia v. Corner Inv. Co., LLC.*, No. 24-5094, 2025 WL 1482990 (9th Cir. May 23, 2025) (finding probable cause under NRS 207.200 where plaintiff refused to acknowledge explicit trespass warning from casino security, then remained inside casino after police warning).

[14] As Judge Sanchez noted, the "district court failed to address the retaliation claim in its order granting summary judgment, even though both parties provided briefing on the elements of a retaliation claim." (Dkt. 60.2, p. 5.)

the existence of probable cause. Third, while the panel emphasized Solomon's later testimony that he was considering setting up further down the FSM sidewalk, he never tried to set up again and never indicated any intent to remain on the sidewalk. Rather, he obeyed Fryman; Solomon's guesses about where he might be able to legally film are irrelevant to whether Fryman had probable cause to detain him for trespassing as he walked away. Finally, the panel did not engage in proper analysis of Solomon's First Amendment retaliation claim under *Nieves v. Bartlett*, 587 U.S. 391, 139 S. Ct. 1715, 204 L. Ed. 2d 1 (2019) and its progeny: even if probable cause existed to arrest Solomon for trespassing, Solomon presented objective evidence that trespassing on the FSM sidewalk is the type of crime where police—including Fryman himself—regularly exercise their discretion not to arrest or detain individuals.

To prevail on a First Amendment retaliation claim, a plaintiff must prove: "(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022). Here, Solomon was (1) engaged in two constitutionally protected activities—filming and verbally challenging Fryman; (2) subjected to detention, handcuffing and arrest, which would chill a

person of ordinary firmness; and (3) Solomon's filming and verbal challenges to Fryman's authority were the cause of his arrest.

Plaintiffs "bringing 'First Amendment retaliatory arrest claims' must generally 'plead and prove the absence of probable cause,' because the presence of probable cause generally 'speaks to the objective reasonableness of an arrest' and suggests that the 'officer's animus' is not what caused the arrest." *Ballentine*, 28 F.4th at 62 (quoting *Nieves*, 139 S. Ct. at 1723-24). However, there is an exception for "cases where 'officers have probable cause to make arrests, but typically exercise their discretion not to do so.'" *Ballentine*, 28 F.4th at 62 (quoting *Nieves*, 139 S. Ct. at 1727). To invoke this exception, a plaintiff must provide "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Ballentine*, 28 F.4th at 62 (quoting *Nieves*, 139 S. Ct. at 1727). However, "evidence of 'virtually identical and identifiable comparators' is not required." *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (per curiam).

A recent decision from the Eastern District of Michigan is instructive. In *Grady v. Cratsenburg*, 769 F. Supp. 3d 609 (E.D. Mich. 2025), the court examined a similar incident where plaintiffs alleged that they were arrested in retaliation for filming (and occasionally yelling at) police from a public sidewalk as police surrounded a house that a suspected shooter had entered. *Id.* at 624. Specifically,

11

after officers told plaintiffs that "that they were standing too close and repeatedly ordered them to back up," they were arrested for, *inter alia*, obstruction but ultimately acquitted. *Id.* Even though the court found that defendants had probable cause to arrest plaintiffs (*id.* at 653) it examined whether their conduct fell under the *Nieves* exception.

The court held that the *Nieves* exception applied and denied defendants summary judgment on the First Amendment retaliation claim. Specifically, the court found that plaintiffs presented objective evidence that they were arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been: BWC footage that "plainly establishes that there were other spectators at the scene, also filming the encounter, and (as *Nieves* requires) were otherwise not engaged "in the same sort of protected speech" that [plaintiffs] were engaged in (i.e. shouting at or criticizing police action…)." *Id.* at 657. This was far more evidence than that proffered by plaintiffs whose *Nieves* arguments were rejected. *Cf. Hollamon v. City of Los Angeles*, 709 F. Supp. 3d 992, 1003 (C.D. Cal. 2023), aff'd, No. 24-341, 2025 WL 927310 (9th Cir. Mar. 27, 2025) (declining to apply *Nieves* exception where plaintiff's "evidence does not establish that 'an analogous circumstance *has ever actually* occurred,' much less that the police treated the situation differently by choosing not to arrest."); *Baker v. Clearwater Cnty.*, No. 22-35011, 2023 WL 3862511, at *2 (9th Cir. June 7, 2023) (Sheriff's statement that

12

he was "not aware of" any arrest for "false arrest for restricting [someone's] movement" not objective evidence that an analogous circumstance had occurred.)

Here, not only was there no probable cause, Solomon presents precisely the type of objective evidence that gave rise to genuine disputes of material fact in *Grady*: footage of similarly situated individuals who were not detained by Fryman. As noted above, Fryman encountered a white photographer on the FSM sidewalk who was similarly situated in nearly every respect to Solomon. At the moment he encountered this photographer, Fryman had the same quantum[15] of probable cause to detain him for trespassing: he had been asked to vacate the sidewalk by FSM security (and Officer Meads) but was still standing there.

Race aside, the only salient differences between this civilian and Solomon were, the other civilian: (1) debated the law with Fryman in a less challenging tone; (2) was attempting to record the event using handheld camera, not a tripod-mounted camera; (3) did not attempt to leave the FSM sidewalk until Fryman finished lecturing; and, (4) was not physically prevented from leaving the sidewalk by Fryman. Fryman's impermissible motivations are further evidenced by his belief that—based on Solomon's constitutionally permissible conduct—Solomon was a

---

[15] Arguably, Fryman had ***more*** probable cause to arrest the white photographer, as he not only stood on the FSM sidewalk longer than Solomon, but had been previously warned that the FSM sidewalk was private multiple times. (EXHIBIT 10 at 4:54 – 5:15.)

"protest agitator." (3-ER-433-34.) If this were not enough, Fryman even told Solomon that he "***talked his way into***" the handcuffs. (EXHIBIT 5 at 4:24-26.) Thus, there is ample objective evidence both that Solomon's speech motivated Fryman's decision to physically detain him and that—even if there were probable cause to detain Solomon—Fryman routinely exercises his discretion not to exercise force against others purportedly trespassing on FSM's sidewalk. Solomon's claim falls within the *Nieves* exception and the panel erred in affirming summary judgment.

### C. Whether Defendants' Restrictions Were Reasonable "Time, Place, and Manner" Restrictions Is Disputed.

The panel concluded that "LVMPD's instruction that Solomon vacate his location on the sidewalk and move west towards an alternative filming location narrowly promotes" the government interest in "ensuring public safety and order, promoting the free flow of traffic on the streets and sidewalks, [and] protecting property rights." (Dkt. 60.1, pp. 2-3 (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)).) Again, Fryman did not tell Solomon to move west, but rather that he leave the immediate area. Furthermore, stopping Solomon from **continuing to walk away** from the supposedly private area, and then surrounding and handcuffing him—effectively blocking the entire sidewalk (EXHIBIT 3 (at 1:50 – 1:55))—does not promote the free flow of sidewalk traffic.

Nor do FSM's "property rights" to an public thoroughfare sidewalk give police officers *carte blanche* to detain and arrest persons who exercise their First

Amendment rights. *See Parks v. City of Columbus*, 395 F.3d 643, 652 (6th Cir. 2005) (a municipality "cannot…claim that one's constitutionally protected rights disappear because a private party is hosting an event that remained free and open to the public"); *Pouillon v. City of Owosso*, 206 F.3d 711, 717–18 (6th Cir. 2000) ( "whether requiring [the plaintiff protestor] to move to the sidewalk was a reasonable time, place, and manner restriction that, as the First Amendment requires, left open ample alternative channels of communication ... should have gone to the jury," where dispute existed as to whether restriction would inhibit his protest); *see also Zalaski v. City of Hartford*, 704 F. Supp. 2d 159, 169 (D. Conn. 2010) (denying summary judgment to defendant police officers on First Amendment claim where officers arrested plaintiff protestors who were "asked to move simply because [an event organizer] did not want them there"). Indeed, where a privately owned sidewalk is a public forum, it would be nonsensical to justify all restrictions based on private property rights.

The panel held that the "restriction allowed ample room for alternative means of communication" because Solomon "could have filmed the protest from across the street" or "from the center median" but instead "violated the officers' instructions and concedes that he intended to continue filming in a restricted area." (Dkt 60.1, p. 3.) As explained above, Solomon was never told to move west (or anywhere else) to film. Thus, as the dissent found, there was a "a genuine dispute whether any

15

alternatives were left open to him given that he was arrested within two minutes of his disagreement with Sgt. Fryman and while he was walking away to find an alternative filming location." (Dkt. 60.2, p. 5.) As detailed above and argued below[16] Defendants never told Solomon to cross the street, go to the center median, or provide any specific guidance as to where the "private" FSM sidewalk ended and the "public" sidewalk began. Rather, they almost immediately surrounded him and detained him while he was walking away, without giving him notice of where he needed to go or an opportunity to get there.

This immediate resort to physical detention falls far short of the required narrow tailoring. *See McCullen*, 573 U.S. at 495, 134 S.Ct. 2518 ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier."); *see also id. at* 486, 2534 (the narrow tailoring requirement demands a "close fit between ends and means" to prevent the government from too readily sacrificing speech for efficiency). While it may have been "easier" for Fryman to detain Solomon to prevent him from filming on FSM's "private" sidewalk, it foreclosed any ability for him to film at all. This is fatal to the constitutionality of a "time, place, and manner"

---

[16] (2-ER-86:1-8)

restriction. *See Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 858 (9th Cir. 2004) (quoting *Grossman v. City of Portland*, 33 F.3d 1200, 1205 (9th Cir.1994)) ("The failure to satisfy any single prong of this test invalidates the requirement.")

Additionally, "time, place, and manner" restriction cannot be reasonable when the "place" at issue is so vague that it affords unbridled discretion to the government authority seeking to abridge those rights. *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Restrictions must "contain narrow, objective, and definite standards to guide" the appropriate authority. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). There were no objective "standards"; whether and where persons could film was left to Fryman's whims and unexplained to Solomon. Thus, genuine disputes of material fact preclude summary judgment on this claim.[17]

## IV.  **CONCLUSION**

Far from being given "ample alternatives" to do his job as a photojournalist, the record reflects that Solomon was never given any instructions regarding where he was trespassed from, or where he could film from, before being detained. Solomon was walking away—not remaining on the property—and ample evidence

---

[17] Despite the panel's statement that "Solomon's large camera tripod obstructed over half of the sidewalk" (Dkt. 60.1, p. 3), it is disputed that Solomon's use of the camera and tripod "actually cause[d] an obstruction on the sidewalk" under the definition of "obstructive use." *See* Clark County Code § 16.11.020(e)(4) (permitting expressive uses unless actually obstructive).

17

reflects that Fryman's decision to detain was motivated by Solomon's verbal disagreement. When viewed in a light most favorable to Solomon,[18] these disputed facts preclude summary judgment.

DATED: July 17, 2025

By: */s/ Leo S. Wolpert*
Margaret A. McLetchie, Esq.
Nevada Bar No. 10931
Leo S. Wolpert
Nevada Bar No. 12658
MCLETCHIE LAW
602 South Tenth Street
Las Vegas, Nevada 89101
Telephone: (702) 728-5300
Fax: (702) 425-8220
Email:maggie@nvlitigation.com
*Attorney for Plaintiff-Appellant*
*Nebyou Solomon*

---

[18] *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021) (quoting *Tuuamalemalo v. Greene*, 946 F.3d 471, 476 (9th Cir. 2019) (per curiam)) (mandating court view "the facts in the light most favorable to the nonmoving party.")

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of FRAP 40(d)(3)(A) and Circuit Rule 40-1(b) because, excluding the parts of the document exempted by Circuit Rule 32-1(c) and FRAP 32(f), this document contains 4,191 words.

2.    This document complies with the typeface requirements of FRAP 32(a)(5)(A) and the type-style requirements of FRAP 32(a)(6) because this document has been prepared in a proportionally spaced typeface Microsoft Word in 14-point Times New Roman.

    DATED: July 17, 2025

By: */s/ Leo S. Wolpert*
Margaret A. McLetchie, Esq.
Nevada Bar No. 10931
MCLETCHIE LAW
602 South Tenth Street
Las Vegas, Nevada 89101
Telephone: (702) 728-5300
Fax: (702) 425-8220
Email: maggie@nvlitigation.com
*Attorneys for Plaintiff-Appellant*
*Nebyou Solomon*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2025, I electronically filed the foregoing PETITION FOR PANEL REHEARING with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

By: */s/ Leo S. Wolpert*
Leo S. Wolpert
An Employee of MCLETCHIE LAW